IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*Ex rel.* Heather Coleman, | ) | CIVIL FILE NO.: 3:19 CV405 |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | |
| | ) | **QUI TAM ACTION** |
| FAMILY FIRST HOME HEALTH CARE,<br>LLC and MARION JAMES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## FILED IN CAMERA AND UNDER SEAL

---

## COMPLAINT PURSUANT TO 31 U.S.C. §3729-3732 OF THE FEDERAL FALSE CLAIMS ACT

None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media. Relator is the original source of this information.

Respectfully submitted this 14th day of August 2019.

W. Stacy Miller, II
N.C. Stat Bar No.: 21198
Miller Law Group, PLLC
P.O. Box 1769
Raleigh, NC 27602
T: (919) 348-4361
F: (919) 729-2953
E: stacy@millerlawgroupnc.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*Ex rel.* Heather Coleman,<br><br>Plaintiff-Relator,<br><br>v.<br><br>FAMILY FIRST HOME HEALTH CARE,<br>LLC and MARION JAMES,<br><br>Defendants. | CIVIL NO.: 3:19cv 405<br><br>**COMPLAINT AND DEMAND FOR<br>JURY TRIAL**<br><br>**FILED UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## PRELIMINARY STATEMENT

This lawsuit is based on the submission of false claims successfully filed for reimbursement from Medicaid by Family First Home Health Care, Inc. ("Family First" or the "Company"), a North Carolina based business, organized and doing business under the laws of that state. Family First owns and operates a home health business with a principal place of business located in Gastonia, North Carolina. Family First employs personal home health aides to provide personal care services for individual patients in their home, then submits claims to, and is reimbursed for those services by Medicaid. The fraud described herein was perpetrated in the United States over a period of at least ten months.

Family First, through its corporate policies, procedures, and officers, presented or caused to be presented, made or caused to be made, or used false records or statements, or caused false records or statements to be used, to cause false or fraudulent claims to be paid or approved by Medicaid. The Relator, Heather Coleman, acting on behalf of and in the name of the United States

of America, brings this civil action under the *qui tam* provisions of the False Claims Act ("FCA") and alleges as follows:

## PARTIES

1.     Plaintiff-Relator Heather Coleman is an individual resident of Gaston County, North Carolina ("Relator"). Relator was employed as an Office Administrator with Family First from May 2018 to February 2019.

2.     Defendant Family First is a North Carolina corporation located in Gastonia, North Carolina that provides in-home aids to customers who need assistance with medical care, activities of daily living, and personal care services. Approximately 99% of the services Family First provides are paid for by the Medicaid program.

3.     Defendant Marion Temeta James ("James" or "Defendant James") is an individual resident of Gastonia, North Carolina and Cherryville, North Carolina, both located in Gaston County, North Carolina and is the founder and CEO of Family First.

4.     Family First and James are hereinafter collectively referred to as "Defendants."

## JURISDICTION AND VENUE

5.     This court has subject-matter jurisdiction over the federal claims presented herein pursuant to 28 U.S.C. § 1331 and 1345, and false claims jurisdiction under U.S.C. § 3732(a). The federal claims asserted in this lawsuit are based on violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, for false claims.

6.     Relator brings this action on behalf of the United States of America against Defendant for treble damages and civil penalties arising from Defendants' violation of the FCA.

7.     This lawsuit is based on Relator 's employment with Family First and direct knowledge of Defendants' activities. None of the allegations set forth in this Complaint are based

2

on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media; Relator is the original source.

8.     Relator has direct and independent knowledge within the meaning of 31 U.S.C. § 3730(e)(4)(B) of the information on which the allegations set forth in this Complaint are based.

9.     Relator has voluntarily, through Relator's attorney, provided this information to the government by way of a written disclosure of substantially all material evidence and information she possesses prior to filing this complaint.

10.     Pursuant to qui tam procedural requirements, a disclosure statement and a copy of this complaint are being submitted to the United States on August 14, 2019.

11.     Upon information and belief, at all relevant times Defendant James was a natural person domiciled within the State of North Carolina under N.C. Gen. Stat. § 1-75.4(1), and served as the CEO of Defendant First Family, a corporation domiciled in the State of North Carolina under N.C. Gen. Stat. § 1-75.4(8).

12.     This Court has personal jurisdiction over each named defendant because the Defendants reside in and conduct substantial business in North Carolina and/or are incorporated in and maintain their principal place of business in North Carolina and have availed themselves voluntarily of the benefits of the laws within this State. These Defendants have sufficient minimum contacts with the state where this Court is located to render personal jurisdiction consistent with applicable due process guarantees.

13.     Venue is proper in the United States District Court for the District of North Carolina, Western District, Charlotte Division pursuant to U.S.C. § 3732(a) as a substantial part of the events or omissions proscribed by U.S.C. § 3732, *et seq.,* and complained of herein took

3

place in this District, and it is also proper pursuant to 28 U.S.C. § 1391, because at all times material and relevant, Defendants transacted and continue to transact business in this District.

## IN CAMERA REVIEW

14. Pursuant to the provisions of 31 U.S.C. § 3730(b)(2), this Complaint is to be filed *in camera* and is to remain under seal for a period of at least 60 days and shall not be served on Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information establishing this cause of action. The Court, at its discretion, may grant continuance of the Seal Order.

## APPLICABLE REGULATORY AND LEGAL BACKGROUND

15. The United States Department of Health and Human Services (hereinafter "HHS"), acting by and through the Centers for Medicare and Medicaid Services (hereinafter "CMS"), is an agency of the United States responsible for implementing laws passed by Congress related to Medicaid. In addition to regulations, CMS issues sub-regulatory guidance to address policy issues as well as operational updates and technical clarifications of existing guidance.

16. Medicaid is administered by states according to CMS federal law. The program is funded jointly by state and federal funds.

17. The Medicaid program, launched in 1965 with the enactment of Title XIX of the Social Security Act, as added, 79 Stat. 286, 42 U.S.C. §§ 1396-1396v, is a cooperative program by which the federal government pays a percentage of the costs a state incurs for medical care for individuals who cannot afford to pay their own medical costs. Although states are not required to provide Medicaid assistance, all 50 states currently do. In exchange for receiving federal financial support for state-run Medicaid programs, states must comply with federal Medicaid laws.

4

18.     North Carolina participates in the federal Medicaid program, and the North Carolina Department of Health and Human Services administers the Medicaid program throughout the state in accordance with Title XIX of the federal Social Security Act, 42 U.S.C. §§ 1396-1396v; N.C. Gen. Stat. § 108A-54.

19.     Providers of medical services who participate in Medicaid programs may bill North Carolina Department of Health and Human Services ("NC DHHS") in accordance with federal procedures. 42 C.F.R. § 455.18; N.C. Gen. Stat. § 108A-54.

20.     United States and North Carolina law requires providers to certify that they comply with all State and Federal Medicaid regulations in order to enroll in the Medicaid program, including complying with requirements for ongoing training, criminal background checks and billing accuracy.

21.     Federal Medicaid regulations require that claims for services under Medicaid be submitted and accurately signed by the provider. 42 C.F.R. § 424.33.

22.     Federal law prohibits anyone from knowingly and willfully making or causing to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal Healthcare Program, including Medicaid. 42 U.S.C. §1320a-7b(a).

23.     The North Carolina False Claims act parallels the federal prohibition of false claims, specifically prohibiting anyone from knowingly and willfully making or causing to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal or State Healthcare Program, including Medicaid. N.C. Gen. Stat. § 1-607(a).

5

## FACTUAL ALLEGATIONS

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, Relator pleads with particularity the conduct set forth below.

24. From May 2018 to February 2019, Relator was employed full-time by Family First Home Health Care, Inc., as an Office Administrator.

25. Relator became aware of fraudulent activity throughout the Company during her employment with Family First. Specifically, she became aware that Family First fraudulently bills for services not rendered, employs non-eligible family members to serve as in-home aides, fails to conduct required supervisory visits or criminal background checks of employees, and forges documentation to hide the Company's fraud.

26. Relator has personal knowledge of the standard corporate practices, operations, procedures, protocols, and billing policies of Family First.

27. Upon information and belief, based on Relator's knowledge of Family First's corporate practices, her personal experience working at the Company for ten months, and her personal communications with agents and/or employees of the Company, including but not limited to the CEO, the Director of Patient Services, in-home aides, and clients, Family First's fraudulent practices set forth in the Complaint have been systemically instituted and resulted in fraud to the United States Government.

28. Relator estimates that at all times from at least May 2018 to present at least 50% to 75% of all claims submitted by Family First for reimbursement under Medicaid have been fraudulent.

29. Upon information and belief, Medicaid reimbursed or otherwise paid Family First in the ordinary course of business for each of the false claims set forth below.

6

## I. BILLING FOR SERVICES NOT RENDERED

30. Paragraphs 1-29 above are hereby realleged and incorporated by reference as if fully set forth herein.

31. Medicaid mandates that in order to receive payment for services provided, those services must have been actually completed by the provider. N.C. Gen. Stat. § 108A-63.

32. Federal Medicaid Regulations require that claims for services under Medicaid be submitted and signed by the provider to attest that the service was conducted. 42 C.F.R. § 424.33.

33. The N.C. Medicaid and Health Choice Clinical Coverage Policy No: 3L "Personal Care Services (PCS)" (November 1, 2018) ("N.C. Medicaid Policy"), section 4.2.2(6) states that "Medicaid shall not cover PCS when . . . the PCS is not completed on the date the service is billed."

34. As set forth below, from at least May 2018 to February 2019, Family First has knowingly submitted Medicaid claims for services not rendered.

35. Family First's fraudulent schemes include submitting Medicaid claims for services not rendered (a) for patients Family First stopped providing services for but continue to bill for services; (b) for patients who only receive occasional, intermittent services, but are billed for daily services; (c) for patients whose caregivers are family members of that patient and are ineligible to receive reimbursement under the Medicaid rules; and (d) for services rendered to other patients by in-home aides that are not, in fact, providing any such services.

### a. Patients Family First Stopped Providing Services for but Continued to Bill

36. From May 2018 to the present, Family First has fraudulently employed a pattern and practice of billing for services not rendered.

7

37. Family First receives most of their referrals from company L.H., a company that assesses individuals for eligibility for the North Carolina Medicaid program and then refers them to caregiver companies, like Family First.

38. For various reasons, Family First stopped providing PCS services to certain patients but continued to bill the Medicaid Program for the services that were not rendered.

39. Through routine audits required by her employment, the Relator became aware of Family First's improper billing for services that were not rendered.

40. The table below lists several examples of fraudulent claims successfully filed in connection with this scheme:

| Table 1. Examples of Billing for Services Not Rendered on Behalf of Patients Previously Terminated or Suspended | | | | |
|---|---|---|---|---|
| Beneficiary Name | Detail | Forged Caregiver or Beneficiary Signature? | Forged in Front of Relator? | Evidence |
| Patient #1 (S.H.)[1] | **Yes.** The last date of service was 4/20/18, but Family First billed Medicaid for services until 9/30/18. | **Yes,** forged both beneficiary and caregiver signatures on timesheet. | No. | Comparison of Fraudulent Bills to DHHS through NC Tracks and Aide Weekly Task Schedule ("Timesheet") |
| Patient #2 (S.G.) | No services were provided from 10/12/18 – 10/31/18, but Family First billed Medicaid for services during that time. The last date of service was | **Yes,** forged both beneficiary and caregiver signatures on timesheet. | Yes. | Comparison of Fraudulent Bills to DHHS through NC Tracks and Aide Timesheet |

---

[1] Throughout this complaint, patient and beneficiary are used interchangeably to indicate individuals who receive services through the North Carolina Medicaid program.

| | | | | |
|---|---|---|---|---|
| | 12/21/18, but the Company billed Medicaid until at least late February 2019. | | | |
| Patient #3 (A.W.) | The last date of service was 11/19/18, but Family First billed Medicaid until at least late February 2019. During that time, the Company claims to have provided services at the patient's residence, but the patient has moved, and the Company does not know the patient's new address. | **Yes,** forged caretaker signature. Timesheets do not contain beneficiary signatures for several dates.<br><br>For the timesheet for services allegedly rendered for the week from 10/13/18 to 10/19/18, another beneficiary is listed even though they billed NC Tracks for services for Patient #3. | No. | Comparison of Fraudulent Bills to DHHS through NC Tracks and Aide Timesheet |
| Patient #4 (C.B.) | The last date of service was 10/3/18, but Family First billed Medicaid for services until at least late February 2019. | **Yes,** forged both beneficiary and caregiver signatures on timesheet. | No. | Comparison of Fraudulent Bills to DHHS through NC Tracks and Aide Timesheet |
| Patient #5 (J.B.) | The last date of service was 10/3/18, but Family First billed Medicaid for services until at least late February 2019. | **Yes,** forged both beneficiary and caregiver signatures on timesheet. | No. | Comparison of Fraudulent Bills to DHHS through NC Tracks and Aide Timesheet |
| Patient #6 (D.B.) | The last date of service was in July 2018 when the patient moved, but Family First billed | **Yes,** forged both beneficiary and caregiver signatures on timesheet. | No. | Fraudulent Bills to DHHS through NC Tracks and Aide Timesheet |

9

| | Medicaid for services until at least late February 2019. | | | |
|---|---|---|---|---|

41.     Family First submits claims according to NC Tracks procedures for services they anticipate rendering for clients in the subsequent month.  Relator is aware of several instances where they claimed they were rendering services, but were not.

42.     Specifically, Family First submitted to and was paid by the North Carolina DHHS Div. of Health Services for services not rendered to Patient #1 (S.H.) because of fraudulently submitted claims on the dates listed below:

    a.   On 3/20/18, Family First submitted and received payment for services allegedly, but not actually rendered from 4/20/18 to 4/30/18.  The patient's last day of service was 4/20/18.

    b.   On 4/20/18, Family First submitted and received payment for 264 units for services allegedly, but not actually rendered from 5/1/18 to 5/31/18.  The patient's last day of service was 4/20/18.

    c.   On 5/21/18, Family First submitted and received payment for 264 units for services allegedly, but not actually rendered from 6/1/18 to 6/30/18.  The patient's last day of service was 4/20/18.

    d.   On 6/21/18, Family First submitted and received payment for 264 units for services allegedly, but not actually rendered from 7/1/18 to 7/31/18.  The patient's last day of service was 4/20/18.

e. On 7/20/18, Family First submitted and received payment for 264 units for services allegedly, but not actually rendered from 8/1/18 to 8/31/18. The patient's last day of service was 4/20/18.

f. On 8/20/18, Family First submitted and received payment for 264 units for services allegedly, but not actually rendered from 9/1/18 to 9/28/18. The patient's last day of service was 4/20/18.

g. On 9/19/18, Family First submitted and received payment for 8 units for services allegedly, but not actually rendered from 9/29/18 to 9/30/18. The patient's last day of service was 4/20/18.

43. Family First submitted to and was paid by the North Carolina DHHS Div. of Health Services for services not rendered to Patient #3 (A.W.) because of fraudulently submitted claims on the dates listed below:

a. On 10/22/18, Family First submitted and received payment for services allegedly, but not actually rendered from 11/20/18 to 11/30/18. The patient's last day of service was 11/20/18.

b. On 11/20/18, Family First submitted and received payment for 320 units for services allegedly, but not actually rendered from 12/1/18 to 12/31/18. The patient's last day of service was 11/20/18.

c. On 12/20/18, Family First submitted and received payment for 320 units for services allegedly, but not actually rendered from 1/1/18 to 1/31/18. The patient's last day of service was 11/20/18.

11

d. On 1/20/18, Family First submitted and received payment for 320 units for services allegedly, but not actually rendered from 2/1/18 to 2/28/18. The patient's last day of service was 11/20/18.

44. Family First submitted to and was paid by the North Carolina DHHS Div. of Health Services for services not rendered to Patient #6 (D.B.) because of fraudulently submitted claims on the dates listed below:

a. On 7/20/18, Family First submitted and received payment for 208 units for services allegedly, but not actually rendered from 8/1/18 to 8/31/18. The patient's last day of service was in July 2018.

b. On 8/20/18, Family First submitted and received payment for 244 units for services allegedly, but not actually rendered from 9/1/18 to 9/30/18. The patient's last day of service was in July 2018.

c. On 9/20/18, Family First submitted and received payment for 200 units for services allegedly, but not actually rendered from 10/1/18 to 10/31/18. The patient's last day of service was in July 2018.

d. On 10/22/18, Family First submitted and received payment for 236 units for services allegedly, but not actually rendered from 11/1/18 to 11/30/18. The patient's last day of service was in July 2018.

e. On 11/20/18, Family First submitted and received payment for 236 units for services allegedly, but not actually rendered from 12/1/18 to 12/31/18. The patient's last day of service was in July 2018.

f.  On 12/20/18, Family First submitted and received payment for 204 units for services allegedly, but not actually rendered from 1/1/19 to 1/31/19. The patient's last day of service was in July 2018.

g.  On 1/22/19, Family First submitted and received payment for 76 units for services allegedly, but not actually rendered from 2/1/19 to 2/28/19. The patient's last day of service was in July 2018.

45.  In addition, upon information and belief, Defendants submitted claims to Medicaid for conducting supervisory visits that never occurred. For example, the Company falsely claims that a supervisory visit occurred on January 8, 2019 from 3 p.m. to 4:15 p.m. for patient #13 "D.C." (see Table 2, below).

46.  Family First submitted a claim for a supervisory visit performed by one of its employees on January 8, 2019; however, that employee did not work at Family First at the time. Upon information and belief, her signature was forged by Company officers.

47.  Upon information and belief, Family First fraudulently invented, documented with forged signatures, and billed to Medicaid several other supervisory visits.

48.  To fraudulently document these services that were never performed, Family First falsifies, creates, and forges documents and signatures as outlined below, and then submits fraudulent bills to the North Carolina Medicaid program through the NC Tracks billing portal.

49.  Upon information and belief, Medicaid reimbursed or otherwise paid Family First in the ordinary course of business for each of the false claims set forth above. Defendants' fraudulent schemes are continuing and ongoing, and Defendants continue to knowingly benefit financially and otherwise from Family First's continued submission of fraudulent claims to and receipt of reimbursements from Medicaid.

13

### b. Billing for Daily Services for Patients Who Only Receive Services on an Intermittent Basis

50.     Family First CEO, Defendant James, and Director of Patient Services, B.M., in addition to their regular roles, are also caregivers for at least ten clients who receive services on an intermittent, non-daily basis, but Defendants nonetheless bill Medicaid for daily services rendered to those clients.

51.     Relator personally witnessed Defendant James and Director of Patient Services B.M. traveling to these patients' homes only occasionally to render services even though they billed Medicaid for services daily.

52.     A table of beneficiaries who received intermittent services, but for whom Family First billed Medicaid daily is provided below.

| Table 2. Examples of Billing for Daily Services for Clients who Only Receive Intermittent, Non-Daily Services | | | |
|---|---|---|---|
| Patient | Caregiver | Forged Caregiver or Patient Signature? | Evidence |
| Patient #7 "M.A." | Marion James (CEO) | **Yes**, both when services were not provided. | Relator personally witnessed that the caregiver listed did not visit patient on a daily basis ("Relator Witness") |
| Patient #8 "P.B." | Marion James (CEO) | **Yes**, both services were not provided. | Relator Witness |
| Patient #9 "J.C." | Marion James (CEO) | **Yes**, both when services were not provided. | Relator Witness |
| Patient #10 "T.K." | Marion James (CEO) | **Yes**, both when services were not provided. | Relator Witness |
| Patient #11 "J.P." | Marion James (CEO) | **Yes**, both when services were not provided. | Relator Witness |
| Patient #12 "C.S." | Marion James (CEO) | **Yes**, both when services were not provided. | Relator Witness |

14

| Patient #13 "D.C." | B.M. (Director of Patient Services) | **Yes**, both when services were not provided. | Relator Knowledge and Signed Supervisory Visit on 1/8/19 that never occurred. The signature of the alleged Registered Nurse who purportedly did the supervisory visit, C.R., appears forged. Beneficiary signature forged. |
| Patient #14 "L.H." | B.M.(Director of Patient Services) | **Yes**, both when services were not provided. | Relator Knowledge |

### c.    Conspiring with Patients and their Family Members to Bill for Services Not Rendered

53.     As set forth in Section II, below, the Company regularly conspires with its patients to violate Medicaid rules by hiring the patient's non-eligible family members to serve as their caregivers.  Further, the Company is aware that some of these non-eligible patient-family member caretakers are not providing services to patients, yet the Company pays them and bills Medicaid for the reimbursement.

54.     In one egregious example, for patient #21, "T.J." (listed in the table below), Family First paid T.J.'s daughter to provide services as the in-home aide to care for T.J.  However, on a regular basis, when T.J. came to the office to pick up her caretaker-daughter's paycheck, she told Family First employees, including the Relator, that T.J., herself, was going to use the money "to get drunk." Realtor has five timesheets for patient T.J. during the periods of 12/22/18 – 1/4/19 and 1/12/19-2/1/19 when Relator witnessed these confessions.

55.     Upon information and belief, despite the fact that Defendants had actual notice that patient T.J. was routinely misappropriating her caretaker's Medicaid paychecks—and thus, that it was highly likely that the caretaker was not, in fact, providing the caretaker services set forth in

15

the patient's Medicaid claims—Family First never followed up to investigate the issue or verify whether the patient was receiving those services.

56.     In addition to T.J. misappropriating her daughter/caretaker's Medicaid paychecks, under the Medicaid rules, her daughter is a non-eligible family member prohibited from serving as T.J.'s caretaker. Upon information and belief, Family First officers created fake caregiver timesheets for T.J.'s care, listing as T.J.'s caregiver the name, and forging the signature of, a person who would have been eligible under Medicaid rules to receive reimbursement as T.J.'s caregiver but who did not, in fact, provide any services to T.J. Defendants then used those forged timesheets to support the fraudulent bills submitted to Medicaid.

57.     Upon information and belief, Medicaid reimbursed or otherwise paid Family First in the ordinary course of business for each of the fraudulent claims described above. Defendants' fraudulent schemes are continuing and ongoing, and Defendants continue to knowingly benefit financially and otherwise from Family First's continued submission of fraudulent claims to and receipt of reimbursements from Medicaid.

## II.     EMPLOYING NON-ELIGIBLE FAMILY MEMBERS

58.     Section 3.2.3(5) of the N.C. Medicaid Policy expressly provides that Medicaid will only authorize reimbursement to in-home caregivers if "no family or household member or other informal caregiver is available, willing, and able to provide the authorized services during those periods of time when the services are provided."

59.     Additionally, section 4.2.2. of the N.C. Medicaid Policy expressly states that "Medicaid shall not cover PCS when: . . . (8) the PCS is provided by an individual whose primary private residence is the same as the beneficiary's primary private residence; (9) the PCS is performed by an individual who is the beneficiary's legally responsible person, spouse, child,

16

parent, sibling, grandparent, grandchild, or equivalent step or in-law relationship to the beneficiary; [or] (10) family members or other informal caregivers are willing, able, and available on a regular basis adequate to meet the beneficiary's need for personal care."

60.     Family First fraudulently violates this rule by routinely hiring family members of patients to act as in-home and residential caretaker aides, including many family members who live in the same private residence as the patient.

61.     The Company then processes and submits these services for Medicaid reimbursement in direct violation of this rule.

62.     Although there is an exception for family members who leave employment or who decline employment to become caretakers, upon information and belief, these family member caretakers were not otherwise employed nor turned down jobs to become a caretaker for their family.

63.     To hide these illegal activities, on patient care records, Family First forges the signatures of Medicaid-eligible, non-family member caretakers in order to falsely support billing to Medicaid, as discussed below.

64.     Relator has evidence of Family First forging documents for at least 13 beneficiaries to cover up the fact that they employ non-eligible family members.

65.     Family First has fraudulently created at least 20 forged timesheets for these 13 beneficiaries who received services from non-eligible family members over a period of nine months (June 2018 to February 2019).

66.     As an example, patient #28 "C.R." billed for in-home caregiver services that he claims were performed by his wife, K.R.. On 8/31/18, the caregiver attestation for this patient appears to be signed by Family First employee "T.B." T.B. does work for Family First, but she

17

did not provide any services to patient C.R. This falsified documentation is consistent with Family First's regular practice of forging the signatures of actual Company employees, like T.B., on patient records in order to avoid detection of the Company's illegal patient-family member hiring practices.

| Employee Attestation | I certify that I provided the tasks recorded for each day of the beneficiary's aide schedule | [REDACTED] | Date: |
|---|---|---|---|
| Beneficiary Attestation (if applicable per licensure requirement) | I received the assistance documented by my aide for the days listed on this form | [REDACTED] | Date: 8/31/19 |

67. Upon information and belief, T.B.'s signature was forged by Family First officers.

68. Relator witnessed Family First Director of Patient Services B.M. forge signatures of patients and caregivers under these circumstances.

69. Family First's pattern of employing non-eligible patient-family members is also supported by a written log of those individuals picking up paychecks from Family First on 6/22/18, 1/4/19, and 2/1/19.

70. Relator has reviewed the Family First employment contracts employing these non-eligible patient-family members as caregivers and confirmed this illegal arrangement through personal, direct discussions with those individuals.

71. Upon information and belief, Medicaid reimbursed or otherwise paid Family First in the ordinary course of business for each of the fraudulent claims described above. Defendants' fraudulent schemes to employ non-eligible family members are continuing and ongoing, and Defendants continue to knowingly benefit financially and otherwise from Family First's continued submission of fraudulent claims to and receipt of reimbursements from Medicaid for services that are not eligible for reimbursement.

72. A table of known family member caretakers is listed below:

18

| Table 3. Examples of Employing Non-Eligible Patient-Family Member Caregivers | | | | |
|---|---|---|---|---|
| Beneficiary Name | Non-Eligible Family Member Caretaker? | Services Billed that were not received by Beneficiary? | Forged Caregiver Signature in Employee Attestation Box? | Evidence |
| Patient #16 "S.A." | Yes. | Unknown. | Yes | Relator Knowledge. |
| Patient #17 "V.C." | Yes. | Unknown. | Yes | Paycheck pick up signatures on 6/22/18, 1/4/19 and 2/1/19 shows the patient's family member works for Family First. |
| Patient #18 "N.E." | Yes. | Unknown. | Yes | Paycheck pick up signatures on 6/22/18, 1/4/19 and 2/1/19 shows the patient's family member works for Family First. |
| Patient #19 "J.E.A." | Yes. | Unknown. | Yes | Relator Knowledge. |
| Patient #20 "A.G." | Yes. | Unknown. | Yes | Relator Knowledge. |
| Patient #21 "T.J." | Yes. | Yes. Beneficiary picked up check to "go get drunk" in patient's words. | Yes | Aide Weekly Task Schedule("timesheet"). |
| Patient #22 "B.K." | Yes. | Unknown. | Yes | Relator Knowledge |
| Patient #23 "E.K." | Yes. | Unknown. | Yes | Relator Knowledge |
| Patient #24 "J.M." | Yes. | Unknown. | Yes | Relator Knowledge |

| | | | | |
|---|---|---|---|---|
| Patient #25 "P.M." | Yes. | Unknown. | Yes | Paycheck pick up signatures on 6/22/18, 1/4/19 and 2/1/19 shows the patient's family member works for Family First. |
| Patient #26 "I.M." | Yes. | Unknown. | Yes | Relator Knowledge |
| Patient #27 "L.P." | Yes. | Unknown. | Yes | Aide Weekly Task Schedule |
| Patient #28 "C.R." | Yes. | Unknown. | Yes | Paycheck pick up signatures on 6/22/18, 1/4/19 and 2/1/19 shows the patient's family member works for Family First. Aide Weekly Task schedule ("timesheet") |
| Patient #29 "M.R." | Yes. | Unknown. | Yes | Employment Contract signed on 8/18/13, Paycheck pick up signatures on 6/22/18, 1/4/19 and 2/1/19 shows the patient's family member works for Family First. |
| Patient #30 "C.T." | Yes. | Unknown. | Yes | Relator Knowledge |
| Patient #31 "T.W." | Yes. | Newer client gets 108 hours of care and her mom is getting paid to care for her. No timesheets turned in as of 2/19. | Unknown. | Relator Knowledge |

| Patient #32 "J.S.C." | **Yes.** Relative, also not receiving level of care client needs. | Unknown. | **Yes** | Relator Knowledge |
| --- | --- | --- | --- | --- |

## III.    FORGING AND FALSIFYING MEDICAID DOCUMENTS

73.    Family First has a flagrant pattern of falsifying and forging several types of Medicaid documentation, most notably the caregiver timesheets that document daily and weekly services to clients and the "In Home Supervisory Visit Report" that documents supervisory visits as discussed supra.

74.    Family First forges timesheets to hide that it is employing non-eligible family members in violation of Medicaid rules, as noted above.

75.    Family First forges "In-Home Supervisory Reports" to fraudulently verify it is following Medicaid law to provide supervisory visits in violation of Section 4.2.2(6) of the N.C. Medicaid Policy.

76.    Family First keeps employee files for every past and present employee so that its officers can copy and forge their signatures in order to commit Medicaid fraud.

77.    Relator has provided evidence for at least 17 clients over the course of ten months whose timesheets were forged.

78.    Upon information and belief, several more fraudulent timesheets exist, but the Company's owner, Defendant James, kept and keeps most of them locked in her office separate from the regular filing system.

79. ~~In addition, Relator has evidence of a falsified and forged "In-Home Supervisory~~ Report" conducted on August 31, 2018.

80. Upon information and belief, the forged signature is of Company employee, C.R., who did not sign the report and who did not work for Family First at the time the supervisory visit was allegedly conducted.

81. All states, including North Carolina, require signatures on documents to reflect the intent of the person signing the document and to be the actual signature of the person physically signing the document. N.C. Gen. Stat. § 66-314.

### a. Forging Signatures to Hide Employment of Family Members

82. State law prohibits Family First from receiving Medicaid reimbursements for a patient's caregiver who is a family member of that patient unless that caregiver leaves or declines other employment in order to become the caregiver. N.C. Medicaid Policy §§ 3.2.3(5) and 4.2.2.

83. The Company employs these types of non-eligible family members, and then forges signatures of other non-family caretakers to hide this fact.

84. For example, Family First pays son/K.R. to provide PCS services for his mother/ M.R. At the instruction of Family First, son/K.R. fills out the timesheet but does not sign the caretaker "employee attestation" signature block and leaves the signature block blank. In the presence of the Relator, B.M., the Direct of Patent Services and daughter of Defendant James, then forges the signature of a licensed non-family member caretaker in the "employee attestation" block, and then submits the claim for reimbursement.

### a. Forging Signatures to Support Fraudulent Billings

85. In addition to forging signatures of caretakers on Medicaid documentation, Family First also forges patient signatures.

86. On several occasions, Family First has stopped providing services to a patient but continued to bill Medicaid for continued services.

87. To support these fraudulent billings, Family First fabricates the entire timesheet.

88. On the caregiver's timesheet, the Company falsely lists services that were not, in fact, provided, which includes fabricating dates and times for those services, claiming to provide services at residence addresses where the patient no longer lives, and forging the signatures of both the caretaker and the patient.

89. Relator personally witnessed Director of Patient Services B.M. forge caregiver and patient signatures for Patient #2 (S.G.) in order to falsify services when that patient was, in fact, discharged.

### a. Forging Signatures to Hide Mistakes

90. Relator has personally witnessed Director of Patient Services B.M. and other Company employees deliberately forge documents to hide mistakes made by caretakers.

91. In particular, Family First officers regularly forged timesheets for caretakers who had incorrectly completed their timesheets. In these cases, B.M. forged both the caretaker and beneficiary's signature.

92. Patient #33 "M.Q.", has a caregiver "A.D.", who turned in a timesheet with clerical errors. Instead of asking A.D. to redo the timesheet, Director of Patient Services B.M. created a new timesheet for that caregiver and forged the caretaker's signature.

93. Upon information and belief, Medicaid reimbursed or otherwise paid Family First in the ordinary course of business for each of the fraudulent claims described above. Defendants' fraudulent forging schemes are continuing and ongoing, and Defendants continue to knowingly

23

benefit financially and otherwise from Family First's continued submission of forged and fraudulent claims to and receipt of reimbursements from Medicaid.

## IV. VIOLATING MEDICAID POLICIES TO CONDUCT TRAINING, CRIMINAL BACKGROUND CHECKS AND SUPERVISORY VISITS

94. In order to submit a claim for Medicaid reimbursement, Family First must assert that it has complied with all Medicaid requirements. N.C Tracts, Medicaid and Health Choice Clinical Coverage Policy. As a regular practice, Family First fails to comply with several of the Medicaid requirements yet submits false assertions to Medicaid that it is in compliance.

### a. Failing to Conduct Required Criminal Background Checks

95. Section 7.10(d) of the N.C. Medicaid Policy requires all PCS Provider Organizations conduct criminal background checks on all in-home and residential care aides before they are hired; ensure that all in-home care aides meet the qualifications contained in the applicable North Carolina Home Care, Adult Care Home, Family Care Home, and Mental Health Supervised Living Licensure Rules; and maintain a file on all in-home and residential aids.

96. Section 6.0 of the N.C. Medicaid Policy prohibits providers from billing for Medicaid PCS services provided by an individual with an enumerated list of convictions.

97. Family First violates Rule 7.10(d) because it hires in-home aides, including family members of patients, without conducting the required background checks.

98. On or about June 2018, Defendant Jones, B.M the Director of Patient Services and the Realtor met with a N.C. Medicaid State Auditor who advised that Family First needed to conduct more thorough background checks. According to those corporate officers, since the time of that audit through at least late-February 2019, Family First has conducted even fewer and less thorough background checks on its caregivers, such that those officers believed that if Family First was audited, the Company would no longer qualify as an eligible Medicaid Provider.

24

99. Additionally, due to the fact that Family First deliberately fails to maintain written records about the employment of non-eligible family member-caretakers, the background checks for those caregivers are necessarily not conducted or kept on file, as required by Medicaid rules.

100. Further, based on basic internet searches on some of those family member-caregivers criminal histories, some of those caretakers have criminal histories that cause them to be ineligible to receive Medicaid reimbursement under Rule 6.0.

### b. Failing to Provided Required Training for In-Home Aides

101. Medicaid rules 42 C.F.R. § 484.65 and N.C. Medicaid Policy § 7.10(e) require all PCS Provider Organizations to "Provide a new employee orientation for all new in-home and residential aides and other agency employees that includes information on state rules pertaining to home care agencies and residential providers and the requirements of this clinical coverage policy."

102. Family First violates this rule by failing to provide training to new in-home caretakers, including family members of patients who are illegally hired to care for patients.

103. Rather than providing any training, Family First merely gives new in-home caretakers a packet of documents regarding in-home caretaking and instructs new caregivers to read the materials.

104. Section 7.10(e) also requires PCS Provider Organizations to "Develop, implement, and manage an ongoing staff development and training program appropriate to the job responsibilities of agency and facility staff."

105. Family First has never developed, implemented, or managed any ongoing staff development and training program, at least for the period of time during which Relator was an employee of the Company.

### c. Failing to Conduct Required Supervisory Visits

106. State and federal law requires that a qualified physician or Registered Nurse ("RN") Supervisor conduct a RN Supervisor visit to each beneficiary's primary private residence location every 90 calendar days.

107. Under Medicaid law, two supervisory visits within 365 calendar days must be conducted when the assigned in-home aide is scheduled for work at the patient's private residence so that they can review the in-home aide's performance.

108. Family First has repeatedly failed to conduct supervisory visits and falsified documentation with forged RN signatures to falsify compliance.

109. For example on August 21, 2018, Relator witnessed Director of Patient Services B.M. forge the signatures of a licensed RN and the name of patient #13 on the "In-Home Supervisors Visit Report Form" to support said scheme.

110. On other occasions, the Relator witnessed Director of Patient Services B.M. forge signatures of patients and the signature of Family First employee C.R. as the R.N. on the "In-Home Supervisors Visit Report Form" to again support said scheme.

111. Upon information and belief, Medicaid reimbursed or otherwise paid Family First in the ordinary course of business for claims after Defendants' fraudulent schemes to falsely assert that Family First is in compliance with State and Federal Medicaid law

112. Upon information belief, Defendants' fraudulent schemes to falsely assert Family First is in compliance with State and Federal Medicaid law are continuing and ongoing, and Defendants continue to knowingly benefit financially and otherwise from Family First's continued submission of these fraudulent claims.

26

## CAUSES OF ACTION

### VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)- FALSE CLAIMS FOR SERVICES NOT RENDERED

113.   Relator reaffirms and realleges the foregoing paragraphs as if fully set forth fully verbatim as related to this specific claim.

114.   From at least May 2018 to February 2019, Family First participated in, filed claims with, sought reimbursement for, and actually received funds from the North Carolina Department of Health and Human Services under the North Carolina Medicaid program.

115.   From at least May 2018 to February 2019, Defendants routinely billed Medicaid for services never provided for former patients whose services were either suspended or terminated.

116.   From at least May 2018 to February 2019, Defendant James, in her position of power, control, and authority of the Company, personally designed, directed, and oversaw this fraudulent scheme. On at least some occasions, as alleged herein, Defendant James personally perpetrated the fraud.

117.   Defendants presented or caused to be presented, for payment or approval by Medicaid, claims that were fraudulent and false on their face, and Defendants did so intentionally and with actual knowledge that the claims were forged, false, and fraudulent.

118.   These fraudulent acts are material because the United States Government would not have paid these claims if it had known they were false.

119.   The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C § 3729(a)(1)(A) by Defendants.

120. The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C § 3729(a)(1) for each fraudulent claim made by Defendants.

121. Relator is also entitled to reasonable attorney fees and costs pursuant to 31 U.S.C. § 3729(d) and a percentage of the government's recovery.

## VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)-MATERIAL NON-COMPLIANCE WITH MEDICAID REGULATIONS

122. Relator reaffirms and realleges the foregoing paragraphs as if fully set forth fully verbatim as related to this specific claim.

123. From at least May 2018 to February 2019, Family First participated in, filed claims with, sought reimbursement for and actually received funds from the North Carolina Department of Health and Human Services under the North Carolina Medicaid program.

124. From at least May 2018 to February 2019, Family First failed to comply with the state and federal regulations required of Medicaid providers submitting claims for reimbursement, including without limitation that Family First failed to adequately train employees, failed to conduct criminal background checks, failed to perform supervisory visits, and employed eligible non-family members of patients as caretakers.

125. From at least May 2018 to February 2019, Defendants routinely and falsely claimed that Family First complied with all state and federal regulations required of Medicaid providers submitting claims for reimbursement.

126. From at least May 2018 to February 2019, Defendant James, in her position of power, control, and authority of the Company, personally designed, directed, and oversaw this

28

fraudulent scheme. On at least some occasions, as alleged herein, Defendant James personally perpetrated the fraud.

127.    Defendants presented or caused to be presented, for payment or approval by Medicaid, claims that were fraudulent and false on their face, and Defendants did so intentionally and with actual knowledge that the claims were forged, false, and fraudulent.

128.    These fraudulent acts are material because the United States Government would not have paid these claims if it had known about Family First's non-compliance with Medicaid rules, as set forth above.

129.    The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C § 3729(a)(1)(A) by Defendants.

130.    The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C § 3729(a)(1) for each fraudulent claim made by Defendants.

131.    Relator is also entitled to reasonable attorney fees and costs pursuant to 31 U.S.C. § 3729(d) and a percentage of the government's recovery.

## VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

132.    Relator reaffirms and realleges the foregoing paragraphs as if fully set forth fully verbatim as related to this specific claim.

133.    From at least May 2018 to February 2019, Defendants knowingly made, used, or caused to be made or used a false record or statement material to Family First's Medicaid claims for reimbursement. Defendants engaged in a concerted pattern and business practice of submitting falsified paperwork for Medicaid reimbursement and to verify compliance with Medicaid law, including submitting: (a) false claims for services never rendered; (b) falsified and forged

signatures to document these false claims to the State and State auditors; (c) falsified records that they conducted supervisory visits and criminal background checks in compliance with Medicaid Law; and (d) forged and fraudulent documents to conceal the illegal use of non-eligible relatives as in-home aids in violation of N.C. Medicaid Policy.

134. Claims that arise from Defendants' creation and use of false records material to fraudulent Medicaid claims violate the False Claims Act because they are fraudulent and false on their face.

135. These fraudulent acts are material because the United States Government would not have paid these claims if it had known that the underlying patient records and other Medicaid documentation was falsified and created with forged patient, caregiver, and supervisor signatures.

136. The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C § 3729(a)(1)(B) by Defendants.

137. The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C § 3729(a)(1)(B) for each fraudulent claim made by Defendants.

138. Relator is also entitled to reasonable attorney fees and costs pursuant to 31 U.S.C. § 3729(d) and a percentage of the government's recovery.

## VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(C)

139. Relator reaffirms and realleges the foregoing paragraphs as if fully set forth fully verbatim as related to this specific claim.

140. From at least May 2018 to February 2019, Defendants violated the False Claims Act by submitting or causing to be submitted Medicaid claims based on forged documents and

falsified billing records for reimbursement. Defendants' schemes included (i) creating or causing to be created forged and falsified employee timecards, and patient records to support Medicaid claims for services not rendered, (ii) falsely continuing to bill for services rendered to former patients whose services were, in fact, previously terminated or suspended, and making fraudulent representations that Family First complied with the required Medicaid laws and policies.

141.    These fraudulent acts are material because the United States Government would not have paid these claims if it had known they were false.

142.    The United States of America is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C § 3729(a)(1)(C) by Defendants.

143.    The United States of America is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C § 3729(a)(1)(C) for each fraudulent claim made by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator, on behalf of herself and the United States of America, pursuant to 31 U.S.C. § 3730(c)(5) and (d), prays as follows:

144.    This Court find that Defendants First Family and James violated the federal False Claims Act pursuant to the causes of action alleged herein;

145.    This Court enter judgment against Defendants Family First and James and award damages in an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus civil penalty of between $5,000 and $10,000 for each action in violation of 31 U.S.C. § 3729 and as adjusted upward by law, and the costs and

31

expenses of this action, with interest, including the costs to the United States Government for its expenses related to this action;

146.     This Court award to Relator an amount of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to the False Claims Act; and

147.     This Court grant any other such relief as required in the interests of justice.

### JURY DEMAND

**RELATOR DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted, this 14th day of August 2019.

W. Stacy Miller, II, N.C. State Bar No. 21198
Miller Law Group, PLLC
P.O. Box 1769
Raleigh, NC 27612
T: (919) 348-4361
F: (919) 729-2953
E: stacy@millerlawgroupnc.com

Blannie Cheng, N.C. State Bar No.: 41156
Miller Law Group, PLLC
P.O. Box 1769
Raleigh, NC 27612
T: (919) 348-4361
F: (919) 729-2953
E: blannie@millerlawgroupnc.com